## GRACE M. CHAPMAN, Respondent, v. J. F. BROWN, Appellant.

### Kansas City Court of Appeals, October 4, 1915.

1. **CONTRACTS: Breach of Promise to Marry.** An action for a breach of promise of marriage is founded on contract and it will be presumed that a party to such a contract possessed legal capacity to enter into it, the burden of proving lack of such capacity being on the opposing party.

2. **INSTRUCTIONS: Error.** It is not error in an instruction to assume the truth of conceded facts, and a court is not in error to instruct the jury to give no effect to defendants' offers of marriage if they believed they were "not made in good faith but to avoid this suit."

3. ———: **Disregarded by Jury.** A breach of promise of marriage, as a breach of any other contract, gives an instant right of action and an offer of defendant to fulfill his promise made after suit is brought by the promisee should be disregarded by the jury as a defense or in mitigation of damages.

Appeal from Cass Circuit Court.—*Hon. A. A. Whitsett*, Judge.

AFFIRMED.

*J. S. Brierly, J. T. Burney* and *C. S. Owsley* for appellant.

*Harry G. Kyle* and *T. N. Haynes* for respondent.

JOHNSON, J.—This is an action for breach of promise of marriage. The petition states a good cause of action and specifically alleges that plaintiff had legal

capacity to intermarry with defendant. The answer admits the promise but alleges, in substance, that it was conditioned upon plaintiff's agreement to enter into a prenuptial contract with defendant providing that in the event of "a serious disagreement and separation" after marriage neither party "should have any interest or title or right in the property of the other by reason of their marriage," and further alleges that plaintiff refused to perform this condition and that defendant "is now ready and willing to carry out and perform the contract of marriage with plaintiff, and does hereby offer in good faith to marry her at any time she may suggest, on the terms and conditions originally agreed upon, that is to say, after plaintiff and defendant shall have entered into their contract in writing concerning their property rights as above stated." The answer states that defendant "knows of no reason why plaintiff and defendant may not intermarry." The jury returned a verdict for plaintiff in the sum of $2000, and on the overruling of his motions for a new trial and in arrest of judgment, defendant appealed.

Plaintiff, whose maiden name was Millie M. Mitchell, was married in 1897 to Edwin M. Chapman and lived with him until 1901 when they separated and Chapman removed to Mangum, Oklahoma, where he engaged in the practice of dentistry. Plaintiff remained in Kansas City and supported herself by keeping a rooming house. The proof shows and defendant concedes that she is a woman of good character. At the trial plaintiff testified she was single at the time of the events in controversy and her counsel introduced in evidence a duly authorized copy of a decree of divorce rendered in February, 1904, by the district court of Greer county, Oklahoma, in an action brought against her by her husband. This decree, which gives the title of the case as "E. M. Chapman v. M. M. Chapman" recites that "defendant having wholly failed to

appear, and being wholly in default for answer or plea, and it appearing to the court that due, legal and proper service has been made and for the required length of time, the defendant is by the court adjudged to be in default. And the court having heard the allegations of plaintiff's petition, and the testimony of plaintiff's witnesses and being fully advised in the premises, finds the issues in this cause in favor of the plaintiff."

Sometime before her marriage, plaintiff, becoming dissatisfied with the name of "Millie" announced to her family and friends her wish to be called "Grace" but she was married under her proper name and during her cohabitation with her husband was called by him and their friends by her initials "M. M.," her husband being known by his initials "E. M." After their separation she resumed the name of Grace and was introduced to and known by defendant as Grace M. Chapman.

Defendant is a bachelor about fifty years of age who owns and resides upon a farm of 200 acres in Cass county. He and plaintiff met in February, 1910, at her home in Kansas City, where he called in response to an advertisement published by her sister who desired employment as a housekeeper. It is not necessary to go into the history of the courtship that had its genesis in this chance encounter. According to the evidence of plaintiff it followed the usual and natural course and culminated in a mutual agreement to intermarry. Defendant's version of their relationship does not differ widely from hers except that he would have it appear that his was the passive role and that she was the aggressor until his reluctance to enter into the state of matrimony was overcome when he became masculine enough and exhibited proper anxiety to hasten the advent of the happy day. But he was cautions and would not be swept off his feet by the floods of passion. Plaintiff had separated from one husband—for good cause, he was convinced—and might become dis-

posed to separate from another. She might not like country life, though she protested her fondness for it, and might yearn to return to the city. He desired that his marriage should be permanent or, if not, that he would escape the burdens and annoyances of rights of dower and alimony. Consequently he would not listen to plaintiff's importunities until she unequivocally agreed to enter into an antenuptial contract that would render a separation disastrous to her from a practical viewpoint.

Plaintiff denies that any such humiliating condition was attached to their mutual promises and states that nothing was said by defendant about entering into a contract of that character until sometime after their engagement. Defendant came to Kansas City one day to buy a wagon and found himself without sufficient money to pay the purchase price. He asked his fiancee to lend him $30 for that purpose. She hesitated but finally drew her check for that amount and gave it to him. After buying the wagon he returned to plaintiff and said: "I have used the check you wrote out for me—you didn't seem very willing to let me have it. I expect it will be just that way after we are married." "No," replied plaintiff, "things will be different after we are married." "Aren't we as good as married now we are engaged?" defendant inquired. Plaintiff answered, "Oh, no, not exactly." Then defendant asked plaintiff if she would be willing to sign a contract that neither should have any interest in the property of the other, if they separated. Plaintiff, astounded, replied "that sounds like a funny question to ask a woman that you are intending to marry." Defendant exclaimed: "I didn't mean it. I was just trying you out to see if you would do it."

The parties agreed to delay the wedding until plaintiff could sell her business. She encountered many delays and disappointments before she finally

192MA6

procured a purchaser. But finally she succeeded in selling everything but some personal belongings which she boxed and shipped to defendant. Pursuant to plans they had agreed upon she removed to a nearby hotel, had cards announcing the wedding printed and wrote defendant giving the date she had selected for the wedding. Unfortunately she put a one-cent stamp on the letter and defendant did not receive it until after the announced date. He hastened to Kansas City and went to plaintiff's hotel, inquired for her and was told she had gone to a nearby restaurant for dinner and desired him to join her there if he should arrive during her absence. It had chanced that after taking her seat at a table in the restaurant, a man with whom she was acquainted entered, seated himself at the same table and was conversing with her when defendant appeared at the door. She beckoned him to come in, but he retreated and waited outside until she finished her meal and joined him. A disagreeable conversation followed and was continued until after midnight. Defendant professed the belief that he had discovered plaintiff in a compromising situation and declared his purpose of breaking the engagement. Plaintiff offered explanations which would have convinced any reasonable person of the innocence of her conduct and implored defendant to keep his promise to marry her. Finally, so plaintiff states, he said, "If I do marry you, you will have to sign a contract before I marry you." "What kind of a contract do you mean?" asked plaintiff. "That your property will be yours and my property will be mine." Plaintiff refused, saying, "it don't look to me that you are on the square since you have treated me the way you have, it don't look to me as though you are acting in good faith." Defendant refused to be married to plaintiff and this suit followed. Two or three days before the trial defendant had a conversation with plaintiff in which he offered to marry her if she would sign the contract. He told her he

had "investigated this matter and never found nothing but what she was all right and had decided if she was willing to do as we talked. . . . I will go out and get the contract drawn up, and you sign that and get the license and we will marry." Plaintiff declined this conditional offer.

In his version of the incidents leading to the breaking of the engagement, defendant assigns as his reason for refusing to marry plaintiff the honest belief, which he admits subsequent investigation demonstrated to be false, that plaintiff was sustaining an improper relationship with her companion at the restaurant table. He did not complain at that time of her failure to enter into his proposed antenuptial contract, nor was the subject of such contract referred to in the conversation which preceded the breaking of the engagement. Defendant places himself in the position of having broken his promise to marry plaintiff, without just cause, and the only defense he offers to the merits of the action is that his original promise was conditioned upon the execution by her of an ante-nuptial contract and her refusal to accept his subsequent offer to perform this conditional promise left her without a meritorious cause of action. On the other hand plaintiff's evidence tends to show that the promise was unconditional and that defendant in breach of its terms, on two occasions, cunningly and falsely tried to turn innocent acts of hers into measures for coercing her into a degrading ante-nuptial agreement, and then breached his promise when the final effort proved unsuccessful.

The verdict resolved this evidentiary controversy in favor of plaintiff and as her evidence is substantial, we are bound by the verdict and must look at the facts of the case from the viewpoint of her evidence.

The first point urged against the judgment is that the court erred in submitting to the jury in the instructions asked by plaintiff the issue of whether or not plaintiff, "at the time of entering into said con-

tract was single and unmarried." It is argued that her capacity to enter into a contract of marriage was a question of law for the court to determine upon the record of the judgment for divorce, which she procured from Oklahoma and introduced in evidence and which defendant contends does not show that the Oklahoma court had jurisdiction, either of the person of plaintiff or of the subject-matter of the action.

We do not find it necessary to go into the question of the sufficiency of that record to show that the former husband of plaintiff had been lawfully divorced from her. The legal capacity of plaintiff to enter into a contract of marriage was expressly admitted in the answer and was not questioned in the proof of defendant or treated as an evidentiary issue. An action for breach of promise of marriage is founded on contract and the general rule that a party to a contract will be presumed, in the absence of an averment and proof to the contrary, to have possessed legal capacity to enter into such contract, obtains in such cases. [4 Am. & Eng. Ency. of Law (3 Ed.), 884; 5 Cyc. 1011; Tucker v. Hyatt, 41 N. E. Rep. (Ind.) 1047; Jones v. Layman, 123 Ind. 569; Ortiz v. Navarro, 30 S. W. Rep. (Tex Civ. App.) 581.] As is well said by the Supreme Court of Indiana in Tucker v. Hyatt, supra: "She did not need to allege or prove that she was a woman, that she was of marriageble age, that she was unmarried, or that she was otherwise competent to enter into a contract of marriage. Her capacity to enter into such contract will be presumed, in the absence of averment and proof to the contrary. In Jones v. Layman, 123 Ind. 569, 24 N. E. 363, which like this was an action on breach of marriage contract, it was contended that the complaint was bad because it was not alleged that the parties were of marriageable age. The court said: 'There is nothing in this objection. The presumption is, as to all contracts, that the parties were competent to contract, until the contrary is made to appear.'"

The burden was on defendant to plead and prove want of capacity in plaintiff to contract and his admission in his answer that she had such capacity settled that question for all the purposes of this case. The most that may be said of the instructions in the respect under consideration is that they imposed a burden upon plaintiff she was not required by law to bear. Of this, defendant could have no cause to complain.

Further defendant objects to instructions given at the request of plaintiff which assumed to cover the whole case and to direct a verdict without requiring the jury to find that defendant refused to marry plaintiff or that plaintiff was ready and willing to marry defendant. The truth of both of the facts was conceded by defendant in his testimony where he not only admitted that plaintiff was ready and willing to marry him and that he refused to perform the contract, but went further and admitted that his refusal was without good cause. It is not error for instructions to assume the truth of conceded facts. [Davidson v. Transit Co., 211 Mo. l. c. 359; Sotebier v. Railroad, 203 Mo. 702; Edwards v. Schreiber, 168 Mo. App. 197; Murphy v. Railroad, 168 Mo. App. 588.]

We do not approve the contention that defendant's offer to marry plaintiff, made after his breach of the contract and after this suit was brought, constitutes a good defense to the action. There may be circumstances under which a bona-fide offer to marry, following an undue delay in the performance of the promise but before the promisee has signified her intention to end the matter, will be treated as a substantial compliance with the promisor's contractual obligation. [Kelly v. Renfro, 9 Ala. 325.] But this is not that kind of case, and the court was right in instructing the jury to give no effect to defendant's offers, if they believed they were "not made in good faith but to avoid this suit."

The general rule is that a breach of promise of marriage, as a breach of any other contract, gives an instant right of action and an offer of defendant to fulfill his promise made after suit is brought by the promisee should be disregarded by the jury, either as a defense or in mitigation of damages. [Waneck v. Kratky, 66 L. R. A. 798; Holloway v. Griffith, 32 Ia. 409; Kurtz v. Frank, 76 Ind. l. c. 596; 4 Am. & Eng. Ency. of Law, 895.]

Other criticisms of the rulings are found to be clearly without merit and need not be discussed. We do not wish to be understood as implying that the ante-nuptial contract proposed by defendant would have been valid if entered into by the parties. We express no opinion on that subject, since the validity of such an agreement may be conceded for argument, and as we have shown the judgment still would be free from the taint of prejudicial error. The case was fairly tried and submitted and the judgment is affirmed.

All concur.